**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW HAMPSHIRE**

```
* * * * * * * * * * * * * * * * * * * * * * * * *
                                    *
In Re: Randall G. Todt               *        Case No.: 11-12617-JMD
       Sharon L. Todt                *        Chapter 7
                     Debtor(s)       *
                                     *
* * * * * * * * * * * * * * * * * * * * * * * * *
                                     *
       Randall G. Todt               *        Adv. No: 15- 01040-JMD
       Sharon L. Todt                *
                     Plaintiffs      *
               V.                    *
                                     *
       Ocwen Loan Servicing, LLC,    *
       Saxon Mortgage Services, Inc., *
                   &                 *
       The Bank of New York Mellon FKA *
       The Bank of New York, as Successor *
       Trustee for JPMorgan Chase Bank, *
       N.A., As Trustee for Novastar Mortgage *
       Funding Trust, Series 2005-3, *
       Series 2005-3 Novastar Home Equity *
       Loan Asset-Backed Certificates, *
       Series 2005-3                 *
                     Defendants      *
                                     *
* * * * * * * * * * * * * * * * * * * * * * * * *
```

## PLAINTIFFS' VERIFIED MOTION
## FOR
## SUMMARY JUDGMENT AS TO LIABILITY
## WITH
## INCORPORATED MEMORANDUM OF LAW AND STATEMENT OF FACTS

NOW COME Plaintiffs, Randall G. and Sharon L. Todt, by and through their Attorney, Raymond J. DiLucci, and pursuant to Fed. R. Civ. P. 56, made applicable in this matter by Fed. R. Bankr. P. 7056, there being no dispute of material fact, respectfully request that this Honorable Court grant this verified Motion for Summary Judgment, as to Liability, and in support thereof represent as follows:

### I.    Introduction

The Plaintiffs in this matter, Randall G. and Sharon L. Todt, hereinafter collectively referred

to as "Todt", or individually as "Randall" and/or "Sharon" respectively, filed a single Count

complaint against the Defendants, Ocwen Loan Servicing, LLC, Saxon Mortgage Services, Inc.,

and The Bank of New York Mellon f/k/a/ The Bank of New York, as Successor Trustee for JPMorgan Chase Bank, N.A., as Trustee for Novastar Mortgage Funding Trust, Series 2005-3, Series 2005-3 Novastar Home Equity Loan Asset-Backed Certificates, Series 2005-3, hereinafter "Ocwen", "Saxon", and "BONY", respectively.  Todts' complaint asserts that Ocwen, Saxon, and BONY repeatedly violated the Discharge Injunction by sending monthly bills seeking payment of a discharged debt, irrelevant notices regarding a discharged debt, and by providing derogatory information regarding the status of the Todts' discharged debt to the Credit Reporting Bureaus in violation of 11 U.S.C. § 524(a).

Todt asserts that both BONY and Saxon were aware of their Chapter 7 Bankruptcy Petition by virtue of having been listed as Creditors holding Secured Claims in Todts' Schedule D filed on July 15, 2011.  That during the pendency of the Todts' Chapter 7 Bankruptcy Case, there were no reaffirmation agreements entered respecting the mortgage or promissory note held by BONY and serviced by Saxon, nor any Orders excluding any of Todts' debts from discharge, nor any indications in the Debtors' Statement of Intention that Todt wished to retain the property; the Todts were granted a Chapter 7 Discharge pursuant to 11 U.S.C. § 727 on January 26, 2012.

On April 2, 2012 Ocwen received the "servicing" rights for Todts' discharged mortgage; Ocwen was aware of Todts' discharge pursuant to 11 U.S.C. § 727 at the time it received said "servicing" rights from Saxon.  Between April 2, 2012 and December 17, 2013 Ocwen sent a total of twenty-one (21) bills and an additional seven (7) letters to Todt demanding payment of the discharged debt.  Over the course of eleven (11) months after Ocwen had foreclosed upon the property, Ocwen sent an additional six (6) letters to Todt further attempting to hold Todt personally liable for the discharged debt on the foreclosed property.  In April of 2014, the Todts' credit reports accurately reflected the status of the mortgage as discharged in Todts' Chapter 7 Bankruptcy; however, in March 2015, the Todts' creditor reports not only failed to indicate that the mortgage was discharged in the Todts' Chapter 7 Bankruptcy, but indicated that the Todts' mortgage was severely delinquent.  Finally, despite having conducted the foreclosure of the

2

property in December, 2013, Ocwen, and BONY failed to file the Foreclosure Deed at the Hillsborough County Registry of Deeds until December 8, 2014; despite having prepared Foreclosure Deeds seemingly suitable for filing in January, 2014, February, 2014 and again in March, 2014.

Pursuant to the relevant binding case law, the multiple demands for payments made with knowledge of the Todts' Chapter 7 Discharge constitute willful violations of the discharge injunction imposed pursuant to 11 U.S.C. § 524, and the inaccuracies contained on the Todts' credit reports along with Ocwen's failure to timely file a Foreclosure Deed with the Hillsborough County Registry of Deeds, have further prevented the Todts' from receiving the financial fresh start they were entitled to receive upon the entry of their Chapter 7 Discharge on January 26, 2012.

## II.  Statement of Material Facts

1. That on or about July 15, 2005, Todt granted a mortgage on their primary residence, hereinafter the "mortgage", to Mortgage Electronic Registration Systems, Inc., hereinafter "MERS", solely as nominee for Ascella Mortgage.  (Admitted by BONY & Ocwen).

2. That the mortgage was recorded with the Hillsborough County Registry of Deeds on or about August 1, 2005, at Book 7513, Page 1884. (Admitted by Ocwen).

3. That on or about October 26, 2007, NovaStar Mortgage, Inc., hereinafter "NovaStar", notified Todt that the servicing rights of the mortgage were being assigned, sold or transferred to Saxon as of November 1, 2007. (See Exhibit 1).

4. That on or about November 1, 2007, Saxon became the servicer for the Mortgage granted by Todt to MERS on July 15, 2005.  (Admitted by BONY & Ocwen).

3

5. That the monthly bills received by Todt, from Saxon were titled, "Mortgage Loan Statements", and contained the following disclaimer on the front side, "If you are a borrower on this loan and have filed for bankruptcy protection, this statement is for information purposes only and is not attempting any act to collect, recover or offset any discharged debt as your personal liability". (see Exhibit 2).

6. That Saxon was including a bankruptcy disclaimer upon bills sent to Todt over three (3) years prior to Todt having filed their Chapter 7 Bankruptcy.

7. That on or about January 29, 2008, Todt notified Saxon of their inability to continue making the mortgage payments, and their desire to sell the property. (see Exhibit 3).

8. That on or about August 20, 2009, MERS assigned the mortgage to The Bank of New York Mellon, as Successor Trustee under NovaStar Mortgage Funding Trust 2005-3. (Admitted by BONY).

9. That said assignment was recorded with the Hillsborough Country Registry of Deeds on August 20, 2009, at Book 8127, Page 442. (Admitted by BONY).

10. That between January 29, 2008 and July 1, 2011, Todt received at least two (2) short sale offers to purchase the property; however, Saxon failed to approve any short sales of the property, located at 136 Chauncey Ave., Manchester, NH, hereinafter "the property". (see Exhibits 4 & 5)

11. That at no point between January 29, 2008 and July 1, 2011 did Todt retract the statements made to Saxon regarding their ability to make monthly mortgage payments.

12. That on or about July 1, 2011, the Todts filed a Voluntary Chapter 7 Bankruptcy Petition in the Bankruptcy Court for the District of New Hampshire and received Case No.: 11-12617-JMD. (admitted in Defendants' Answer, see Doc. No.: 22; ¶ 22)

13. That the Todts listed a secured claim owed to "Saxon Mortgage Services, Inc." in Schedule D for the Mortgage, in the approximate amount of $338,000.00.  (See NH Bankruptcy Case No.: 11-12617-JMD, Doc. No. 8, Page No.: 14).

14. That the Todts also listed BONY as a Creditor on Schedule D.  (See *Id.*).

15. That Saxon received notification that Todt filed a Voluntary Chapter 7 Bankruptcy Petition. (Admitted by Ocwen).

16. That on or about July 15, 2011, BONY and/or Saxon hired its attorneys, Ablitt/Scofield, P.C., to prepare a Motion for Relief from the Automatic Stay in Todts' Chapter 7 Bankruptcy Case.  (see Exhibit 6).

17. That on or about July 27, 2011, Ablitt/Scofield, P.C., prepared the Motion for Relief from the Automatic Stay, complete with a Certificate of Service; however, the Motion was never filed.  (see Exhibit 7).

18. That Saxon did not file a Proof of Claim in Todts' Voluntary Chapter 7 Bankruptcy Case. (Admitted by Ocwen).

19. That no Proof of Claim was filed in Todts' Chapter 7 Bankruptcy by or on behalf of either NovaStar, or BONY regarding the property. (See claims register, NH Bankruptcy Case No.: 11-12617-JMD).

20. That Todt and Saxon did not execute a Reaffirmation agreement of the mortgage. (Admitted by Ocwen).

21. That Todt and BONY did not execute a Reaffirmation agreement of the mortgage (Admitted by BONY).

22. That no Reaffirmation of Debt Agreement was entered into pertaining to the property. (see Docket Report, NH Bankruptcy Case No.: 11-12617-JMD).

23. That Saxon did not object to Todt receiving a discharge in their Voluntary Chapter 7 Bankruptcy Case.  (Admitted by Ocwen).

24. That BONY did not object to Todt receiving a discharge in their Voluntary Chapter 7 Bankruptcy Case. (Admitted by BONY).

25. That on or about January 26, 2012, this Honorable Court entered a Standard Discharge Order in the Debtors' Voluntary Chapter 7 Bankruptcy.  Thereby, discharging the Debtors from their obligations under the mortgage.  (see NH Bankruptcy Case No.: 11-12617-JMD; Doc. No. 19) (Admitted by BONY & Ocwen with respect to the Date the Standard Discharge was entered).

26. That on March 15, 2012, Land Records of America prepared a Foreclosure Report for Todts' property.  (see Exhibit 8).

27. That on or about March 23, 2012, Summit Title Corporation issued an Invoice to Ablitt/Scofield, P.C. for "Title Exam", "Title update", "recording of AOM", and travel regarding Todts' property.  (see Exhibit 9).

28. That on or about March 23, 2012, Ablitt Scofield, P.C. issued an invoice for "Foreclosure – Foreclosure Services – Non-Judicial" to Saxon for foreclosure related fees and services incurred on or about February 23, 2012.  (see Exhibit 10).

29. That on April 2, 2012, Ocwen acquired the servicing rights for the loan from Saxon. (Admitted by BONY; see Exhibit 11)

30. That on or about April 11, 2012 Ocwen sent Todt a letter stating that the total amount due from Todt was $436,907.41. (Admitted by Ocwen; see Exhibit 12)

31. That the letter sent by Ocwen to Todt on April 11, 2012 stated "This letter is in no way intended as a payoff statement for your mortgage. It merely states the amount of the debt as of the date of this letter…unless, within thirty (30) days after receipt of this notice, you dispute the validity of this debt or any portion thereof, we will assume the debt to be valid." (Admitted by Ocwen; see Exhibit 12).

32. That on April 12, 2012, Ocwen sent a billing statement to Todt which stated that the total amount due was $140,574.80. (Admitted by Ocwen; see Exhibit 13).

33. That on May 16, 2012, Ocwen sent a billing statement to Todt which stated that the total amount due was $143,484.21. (see Exhibit 14).

34. That on June 18, 2012, Ocwen sent a billing statement to Todt which stated that the total amount due was $146,324.64. (Admitted by Ocwen; see Exhibit 15).

35. That on July 17, 2012, Ocwen sent a billing statement to Todt which stated that the total amount due was $149,270.09. (Admitted by Ocwen; see Exhibit 16).

36. That on August 17, 2012, Ocwen sent a billing statement to Todt which stated that the total amount due was $152,026.50. (Admitted by Ocwen; see Exhibit 17).

37. That on September 17, 2012, Ocwen sent a billing statement to Todt which stated that the total amount due was $154,925.41. (Admitted by Ocwen; see Exhibit 18).

38. That on October 17, 2012, Ocwen sent a billing statement to Todt which stated that the total amount due was $157,681.82.  (Admitted by Ocwen; see Exhibit 19).

39. That on November 19, 2012, Ocwen sent a billing statement to Todt which stated that the total amount due was $160,154.67.  (Admitted by Ocwen; see Exhibit 20).

40. That on or about December 10, 2012, The Bank of New York Mellon, as Successor Trustee under NovaStar Mortgage Funding Trust, Series 2005-3 assigned the mortgage to BONY "without recourse, representation or warranty". (Admitted by BONY as to the existence of the Assignment; see Exhibit 21).

41. That on December 17, 2012, Ocwen sent a billing statement to Todt which stated that the total amount due was $162,911.08.  (Admitted by Ocwen; see Exhibit 22).

42. That on January 17, 2013, Ocwen sent a billing statement to Todt which stated that the total amount due was $165,830.99.  (Admitted by Ocwen; see Exhibit 23).

43. That on or about January 18, 2013, Altisource prepared a "Foreclosure Information Report" for Ablitt/Scofield, P.C. (see Exhibit 24).

44. That on or about January 23, 2013, the assignment to BONY was recorded with the Hillsborough County Registry of Deeds at Book 8519, Page 1018.  (Admitted by BONY; see Exhibit 21).

45. That on February 18, 2013, Ocwen sent a billing statement to Todt which stated that the total amount due was $168,576.90 (Admitted by Ocwen; See Exhibit 25).

46. That on March 7, 2013, Ocwen sent a letter to Todt stating that "Although Ocwen Loan Servicing, LLC has made several attempts to contact you regarding the serious situation concerning your home, your situation remains unresolved."  (Admitted by Ocwen; See Exhibit 26).

47. That on March 15, 2013, Ablitt/Schofield, P.C. sent certified letters to Todt informing them that a Foreclosure Sale had been scheduled for April 10, 2013 at 3:00 P.M. (see Exhibit 27).

48. That on March 18, 2013, Ocwen sent a billing statement to Todt which stated that the total amount due was $171,593.81.  (Admitted by Ocwen; see Exhibit 28).

49. That on April 5, 2013, Ocwen sent a letter to Todt stating that "Although Ocwen Loan Servicing, LLC has made several attempts to contact you regarding the serious situation concerning your home, your situation remains unresolved."  (See Exhibit 29).

50. That on April 17, 2013, Ocwen sent a billing statement to Todt which stated that the total amount due was $174,350.22.  (Admitted by Ocwen; see Exhibit 30).

51. That on or about April 19, 2013, Altisource prepared an updated "Foreclosure Information Report" for Ablitt/Scofield, P.C. (see Exhibit 31).

52. That on May 3, 2013, Ocwen sent a letter to Todt stating that "Although Ocwen Loan Servicing, LLC has made several attempts to contact you regarding the serious situation concerning your home, your situation remains unresolved."  (see Exhibit 32).

53. That on May 17, 2013, Ocwen sent a billing statement to Todt which stated that the total amount due was $177,181.63.  (Admitted by Ocwen; see Exhibit 33).

54. That on or about June 13, 2013, Altisource prepared an updated "Foreclosure Information Report" for Ablitt/Scofield, P.C. (see Exhibit 34).

55. That on June 17, 2013, Ocwen sent a billing statement to Todt which stated that the total amount due was $180,091.04.  (Admitted by Ocwen; see Exhibit 35).

56. That on July 3, 2013, Ocwen sent a letter to Todt notifying them that their monthly payment would increase as of the payment due September 1, 2013 pursuant to an interest rate adjustment.  (see Exhibit 36).

57. That on July 9, 2013, Ocwen sent a letter to Todt stating that, "Ocwen ha[d] assigned Carlos Rosario to serve as [Todts'] Relationship Manager… [Todts'] Relationship Manager will be responsible for monitoring [Todts'] account, making sure that we have all your critical information and carefully reviewing your situation.  We will be contacting you within the next few days to schedule an in-depth consultation to review your account status…" (Admitted by Ocwen; see Exhibit 37).

58. That on July 17, 2013, Ocwen sent a billing statement to Todt which stated that the total amount due was $182,932.95.  (Admitted by Ocwen; see Exhibit 38).

59. That on August 19, 2013, Ocwen sent a billing statement tot Todt which stated that the total amount due was $185,678.87.  (Admitted by Ocwen; see Exhibit 39).

60. That on September 17, 2012, Ocwen sent a billing statement to Todt which stated that the total amount due was $188,435.29.  (Admitted by Ocwen; see Exhibit 40).

61. That on October 16, 2013, Ocwen sent a letter to Todt stating that "Although Ocwen Loan Servicing, LLC has made several attempts to contact you regarding the serious situation concerning your home, your situation remains unresolved."  (see Exhibit 41).

62. That on October 17, 2013, Ocwen sent a billing statement to Todt which stated that the total amount due was $192,316.71.  (Admitted by Ocwen; see Exhibit 42).

63. That on November 14, 2013, Connolly, Geaney, Ablitt & Williard, P.C sent certified letters to Todt informing them that a Foreclosure Sale had been scheduled for December 16, 2013 at 12:00 P.M. (see Exhibit 43).

64. That on November 18, 2013, Ocwen sent a billing statement to Todt which stated that the total amount due was $195,582.63.  (Admitted by Ocwen; see Exhibit 44).

65. That on December 16, 2013, BONY held a foreclosure sale on the property located at 136 Chauncey Ave., Manchester, NH 03104.  (Admitted by BONY).

66. That on December 17, 2013, Ocwen sent a billing statement to Todt which stated that the total amount due was $199,872.83.  (Admitted by Ocwen; see Exhibit 45).

67. That each one of the billing statements sent by Ocwen to Todt between April 12, 2012 and December 17, 2013 contained the following statement on the front side, "If you are currently in bankruptcy of if you have filed for bankruptcy since obtaining this loan, please read the bankruptcy information provided on the back of this statement." (See Exhibits 13-20, 22-23, 25, 28, 30, 33, 35, 38-40, 42, and 44-45)

68. That each one of the billing statements sent by Ocwen to Todt between April 12, 2012 and December 17, 2013 contained the following statement on the lower portion of the back side,

> "*IMPORTANT  BANKRUPTCY  INFORMATION  If you or your account are subject to a pending bankruptcy or the obligation referenced in this statement has been discharged in bankruptcy, this statement is for informational purposes*

*only and is not an attempt to collect a debt.  If you have any questions regarding this statement, or do not want Ocwen to send you monthly statements in the future, please contact us…"*  (See Exhibits 13-20, 22-23, 25, 28, 30, 33, 35, 38-40, 42, and 44-45).

**69.** That each one of the billing statements sent by Ocwen to Todt between April 12, 2012 and December 17, 2013, contain the following statement on the front side directly above the "payment coupon", "Please detach and return bottom portion with payment in the enclosed envelope with address visible. (See Exhibits 13-20, 22-23, 25, 28, 30, 33, 35, 38-40, 42, and 44-45).

70. That each one of the billing statements sent by Ocwen to Todt between April 12, 2012 and December 17, 2013, contained the following "Important Message" on the front side, "We may report information about your account to credit bureaus.  Late payments, missed payments, or other defaults on your account may be reflected in your credit report."  (See Exhibits 13-20, 22-23, 25, 28, 30, 33, 35, 38-40, 42, and 44-45).

71. That in addition to the "total amount due" each one of the bills sent by Ocwen to Todt between April 12, 2012 and December 17, 2013, indicated that in addition to the "current amount due" the "Past Due Amounts [were] DUE IMMEDIATELY".  (See 13-20, 22-23, 25, 28, 30, 33, 35, 38-40, 42, and 44-45) (EMPHASIS in Original).

72. That on January 14, 2014, a Foreclosure Deed was prepared, but was not filed.  (see Exhibit 46).

73. That on February 17, 2014, a Foreclosure Deed was prepared, but was not filed.  (See Exhibit 47).

74. That on February 25, 2014 Todt received a letter from Middlesex Mutual Assurance Co. informing them that it had received a request to "not renew the flood insurance policy." (See Exhibit 48).

75. That on March 26, 2014, a Foreclosure Deed was prepared, but was not filed. (See Exhibit 49).

76. That on or about April 24, 2014, the Todts received copies of their Credit reports through annualcreditreport.com. (see Affidavits of Sharon & Randall Todt).

77. That in April, 2014, Sharon's Equifax Credit Report accurately reflected that the debt owed to Ocwen was "Included in Bankruptcy" and "Bankruptcy discharged". (Admitted by Ocwen; see Exhibit 50).

78. That in April, 2014, Sharon's Equifax Credit Report accurately reflected that the debt owed to Saxon was "Included in Bankruptcy" and "Bankruptcy discharged". (Admitted by Ocwen; see Exhibit 50).

79. That in April, 2014, Sharon's Experian Credit Report accurately reflected that the debt owed to Ocwen was "Discharged through Bankruptcy Chapter 7". (Admitted by Ocwen; See Exhibit 51).

80. That in April of 2014, Todts' credit reports, and "credit scores", were sufficient for them to be approved for a mortgage through Wells Fargo.

81. That Wells Fargo subsequently denied the Todts' request for a mortgage because neither Ocwen nor BONY had filed a Foreclosure Deed with respect to the property subject to the mortgage. (See Affidavits of Sharon & Randall Todt).

82. That on September 9, 2014, Ocwen sent a letter to Todt notifying them that Carlos Rosario had been assigned as their relationship manger; Mr. Rosario would "assist [Todt] in identifying solutions for their mortgage." (see Exhibit 52)

83. That on September 26, 2014, Ocwen sent a letter to Todt informing them that their Hazzard Insurance policy had expired, and should Todt fail to provide proof of insurance to Ocwen, Ocwen would purchase a policy and Todt would be responsible for reimbursing Ocwen for the policy. (see Exhibit 53).

84. That on October 16, 2014, Ocwen sent an Annual Escrow Account Disclosure Statement detailing actual and scheduled activity in Todts' escrow account between October, 2008 and November, 2014, and informing Todt that their monthly mortgage payments, beginning with the payment due December 1, 2014, would increase to $2,621.47. (see Exhibit 54).

85. That on October 26, 2014, Ocwen sent a "Second and final notice" to Todt informing them that it they failed to provide proof of insurance to Ocwen, Ocwen would purchase a policy and Todt would be responsible for reimbursing Ocwen for the policy. (see Exhibit 55).

86. That on November 7, 2014, Ocwen acting as attorney-in-fact for BONY executed a Foreclosure Deed for the property located at 136 Chauncey Ave., Manchester, NH 03104, from BONY to BONY, as the high bidder at the foreclosure sale held on December 16, 2013. (Admitted by BONY & Ocwen; see Exhibit 56).

87. That on or about December 8, 2014, Ocwen filed the Foreclosure Deed with the Hillsborough County Registry of Deeds at Book 8712, Page 2244. (See Exhibit 56).

88. That on or about December 23, 2014, Ocwen sent an Escrow Analysis Statement Notification to Todt informing them that the October 15, 2014 [sic] escrow analysis was sent in error, and that "Current monthly payments should continue to be made until Ocwen provides a new escrow analysis, which will reflect the new payment amount and effective date." (See Exhibit 57).

89. That on or about March 27, 2015, the Todts checked their credit reports. (See Affidavits of Sharon & Randall Todt).

90. That in March, 2015, Randall's Equifax Credit Report stated that there were monthly payments due to Saxon in the amount of $856.00. (Admitted by Ocwen; see Exhibit 58).

91. That in March, 2015, Randall's Equifax Credit Report stated that the current status of the debt owed to Saxon was "120+ days past due". (Admitted by Ocwen; see Exhibit 58).

92. That in March, 2015, Sharon's Credit Report stated that the mortgage serviced by Ocwen was "Open". (Admitted by Ocwen; see Exhibit 59).

93. That in March, 2015, Sharon's Credit Report stated that the mortgage serviced by Ocwen was "120-149 days late". (Admitted by Ocwen; see Exhibit 59).

94. That in March, 2015, Sharon's Credit Report stated that the past due amount of the mortgage serviced by Ocwen was "$65,000.00". (Admitted by Ocwen; see Exhibit 59).

95. That in March, 2015, Sharon's Credit Report stated that there were monthly payments due to Ocwen in the amount of $2,746.00. (Admitted by Ocwen; see Exhibit 59).

96. That in March, 2015, Sharon's Credit Report indicated that the mortgage serviced by Saxon is "120-149 days late". (Admitted by Ocwen; see Exhibit 59).

97. That on May 19, 2015, Ocwen sent a letter to Todt stating in relevant part that, "Ocwen acquired the servicing rights of the account from Saxon Mortgage Services, Inc. on April 2, 2012, with the account scheduled for the October 1, 2008 and in foreclosure.  Ocwen's records indicate you filed for protection under Bankruptcy Chapter 7 on July 1, 2011, which was subsequently discharged on January 26, 2012."  (see Exhibit 60).

## III.   Summary of Law

Summary Judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), made applicable in this proceeding by Fed. R. Bankr. P. 7056.  The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact".  Celotex Corp. v. Catrett, 477 US 317 (1986).  Where the non-moving party would bear the burden of proof at trial, the moving party may carry its summary judgment production burden by pointing out an absence of evidence to support the non-moving party's case.  *Id*. At 328.  While the evidence is viewed in the light most favorable to the non-moving party, the non-moving party must set forth specific facts showing that there is a genuine issue of material fact for trial.  Welch v. Ciampa, 542 F.3d 927, 935 (1st Cir., 2008).  Once the moving party has met its initial burden of properly supporting is motion, the burden shifts to the non-moving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it".  Ayala-Genara v. Bristol Myers-Squibb Co, 84 F.3d.86, 94 (1st Cir., 1996) (Citing Celotex Corp v Catrett, 477 U.S. 323 (1986); Anderson v. Liberty Lobby, Inc., 477 US 242, 249 (1986)).  When the non-moving party "cannot produce such evidence, the motion must be granted".  *Id.*  Further, conclusory allegations and improbable inferences are insufficient to defeat a properly support motion for summary judgment.  Carroll v. Xerox Corp., 294 F.3d 231, 234 (1st Cir., 2002).

## IV.     Argument

### A.     Ocwen and BONY Violated the Discharge Injunction

Upon the entry of the Standard Discharge under 11 U.S.C. §727 on January 26, 2013, by the Bankruptcy Court for the District of New Hampshire, Todt was discharged from any personal liability to pay the underlying promissory note securing the mortgage on their personal residence held by BONY and serviced by Ocwen.  Although, the Discharge was entered under 11 U.S.C. §727(b), its effect is defined by 11 U.S.C. §524(a), which states in relevant part, that:

> *A discharge in a case under this title –*
>
> *\* \* \* \* \* \* \* \**
>
> *(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor...* 11 U.S.C. § 524(a)(2)

The First Circuit views violations of the Discharge Injunction as analogous to Violations of the Automatic Stay.  *In re Pratt*, 462 F.3d 14, 19 (1st Cir. 2006).  Pursuant to the relevant, binding case law a creditor violates the automatic stay, or the discharge injunction, by engaging in coercive or harassing tactics.  *In re Jamo*, 283 F.3d 392, 399 (1st Cir., 2002); citing *Cox v. Zale Del., Inc.*, 239 F. 3d 910, 912 (7th Cir., 2001).  The First Circuit has defined coercive actions to collect a debt as being those that are "tantamount to a threat".  *Jamo*, 283 F.3d at 402.  Aside from *dicta* indicating that communications initiated by the debtor "might preclude a finding [of] harass[ment]", the First Circuit has not developed a similar standard for determining when acts to collect a discharged debt constitute harassment.  *Pratt*, 462 F.3d at 19.  However, the Bankruptcy Court for the District of Maine has noted that, "Congress clearly intended that any behavior engaged in by a creditor that pressures a debtor to repay a discharged debt in any way is prohibited by §524."  *Collins v. Wealthbridge Mortgage, Corp.*, 474 BR 317, 320 (Bankr. Me., 2012); citing Senate Report No.: 95-989.  Furthermore, this Court recently found that a single automated telephone message from a mortgagee regarding lapsed homeowners insurance on a

discharged debt was sufficient to rise to the level of harassing. *Bates v. CitiMortgage, Inc.*, 517 B.R. 395 (Bankr. N.H., 2014); *Affirmed* in *Bates v. CitiMortgage, Inc.*, 2016 DNH 26 (D.N.H., 2016).

In *Collins*, the Debtors filed a Chapter 7 Bankruptcy in April of 2008, indicated an intent to surrender their personal residence to the then servicer of the mortgage, Citicorp, and received a Chapter 7 Discharge on July 8, 2008. *Collins*, 474 B.R. at 318-319. The Servicing of Collins' mortgage was transferred to Marix in October, 2010; Marix had notice of the Collins' Chapter 7 Discharge at the time it received the servicing rights. *Id.* at 319. After Marix obtained the servicing rights it sent Collins eight (8) letters which were deemed to be harassing despite the inclusion of "bankruptcy disclaimers" on the letters. *Id.* at 318. The Court in *Collins* ultimately determined that "while the presence of disclaimer language has operated to mitigate a finding of harassment or coercion in previous cases, it does not do so here. Marix had no reason whatsoever to send these letters to the Collins'. In light of the Collins' discharge, and the actual notice Marix admits to having of [Collins' discharge], purposeless letter relating to past debts and obligations constitute harassment proscribed by the discharge injunction." *Id.* at 321. The *Collins* Court further noted that "Marix was not free to simply treat the Collins' like "any other debtor" (viz., as if there had been no bankruptcy) when, in fact, they were no longer debtors at all. The Collins' deserved a fresh start without being harried by their former creditor." *Id.* at 322.

The factual background in *Collins* is nearly identical to the present matter, Like Collins, who filed a Voluntary Chapter 7 Bankruptcy, and received a Chapter 7 Discharged, Todt filed a Voluntary Chapter 7 Bankruptcy, and received a Chapter 7 Discharge. Like Collins, who indicated an intent to surrender their former personal residence, at no point during, or after the bankruptcy did Todt indicate to the mortgagee that they wished to retain, either by reaffirming or redeeming, their pre-bankruptcy personal residence. Like Collins, whose mortgage servicer changed from CitiMortgage to Marix shortly after receiving the Chapter 7 Discharge, the servicing rights to Todts' then discharged mortgage obligation, were transferred from Saxon to

Ocwen.   Finally, like the mortgagee in Collins, BONY and Saxon were aware of Todts' Bankruptcy filing, and discharge; this information was subsequently received by Ocwen when the servicing rights transferred.

The factual background between *Collins* and this case differs substantially with respect to the extent of the harassment experienced regarding the discharged mortgage obligations.   Unlike Collins, who received a total of eight (8) harassing notices from Marix, Todt received twenty-one (21) monthly bills seeking to collect the discharged mortgage debt.   Each such bill received by Todt from Ocwen stated, "Past Due Amounts DUE IMMEDIATELY", "Total amount due", and "Please detach and return bottom portion with payment".   Additionally each of the twenty-one (21) bills sent by Ocwen to Todt contained a payment coupon which reiterated the total amount due, and indicated the total amount due with the applicable late fee if received after the grace period.   In addition to the twenty-one (21) bills sent by Ocwen to Todt seeking to collect a discharged debt, Ocwen sent at least seven (7) letters to Todt seeking to discuss Todts' "serious situation" regarding the status of the Todts' discharged debt.   After the foreclosure sale, Ocwen sent an additional six (6) letters regarding Todts' discharged debt, and delayed filing the Foreclosure Deed for almost a year after the foreclosure sale, further delaying Todts' ability to receive their financial fresh start.   Finally, more than three (3) years after having completed their Bankruptcy, and receiving their Discharge, Ocwen was providing negative information to the Credit Bureaus regarding the status of Todts' discharged financial obligations.

Like Collins, who the Bankruptcy Court determined were entitled to receive a financial fresh start without being harassed by their mortgage servicer regarding a discharged obligation, Todt was similarly entitled to receive a financial fresh start without receiving monthly bills from Ocwen constituting a harassing reminder of the financial difficulties they had experienced. Finally, like Marix, Ocwen was not free to treat Todt like any other debtor, when in fact, Todt were no longer debtors at all.

**B.**      **The Safe-Harbor Provisions of 11 U.S.C. §524(j) Are Inapplicable**

In 2005, when the Bankruptcy Code was amended by BAPCPA, Congress added 11 U.S.C.

§524(j) to the Bankruptcy Code, which states that:

> *Subsection (a)(2) does not operate as an injunction against an act by a creditor that is the holder of a secured claim, if – (1) such creditor retains a security interest in real property that is the principal residence of the debtor; (2) such act is in the ordinary course of business between the creditor and the debtor; and (3) such act is limited to seeking or obtaining periodic payments associated with a valid security interest in lieu of pursuit of in rem relief to enforce the lien.*

Since 2005, this Honorable Court has considered the effect of §524(j) on four (4) occasions,

two (2) of which were subsequently affirmed on appeal; there do not appear to be any other

decisions regarding the effects of §524(j) by any of the other courts within the First Circuit.

In *In re Manning*, the Debtors, Kevin and Sandra Manning (hereinafter "Manning"), filed a

Chapter 7 Bankruptcy on March 31, 2009, and indicated an intent to reaffirm the first mortgage

held by CitiMortgage on the primary residence.  *In re Manning*, 505 BR 383, 385 (Bankr. N.H.,

2014).  Despite the debtors' execution of a reaffirmation agreement, the agreement was never

filed with the Bankruptcy Court, and the Mannings received a Chapter 7 Discharge on September

10, 2009.  *Id.*  After the entry of the Mannings' discharge the Debtors continued to make their

monthly mortgage payments to CitiMortgage for a period of over two (2) years, believing that

they had reaffirmed their mortgage.  *Id.*  It was not until December, 2011, when the Debtors'

sought to refinance their mortgage, that Manning learned CitiMortgage was not reporting the

post-discharge payments to the credit reporting bureaus.  *Id.*  Manning then contacted

CitiMortgage about its failure to report payments, and at this point learned that the mortgage had

not been reaffirmed.  *Id.*  CitiMortgage informed Manning that if they made a payment of

$2,462.00, to bring the payments current, they would enter into a second reaffirmation agreement;

CitiMortgage represented that it would not report Mannings' post-discharge payment status to the

credit reporting bureaus unless a valid reaffirmation agreement existed.  *Id.*  In November, 2012,

after making the requested payment, filing a Motion to reopen the Bankruptcy Case, and

20

executing a second reaffirmation agreement, Manning filed a Complaint for Violation of the Discharge Injunction based upon CitiMortgage's failure to report the status of post-discharge mortgage payments to the credit reporting bureaus.  *Id.* at 386.  This Court found that the communications and representations made by CitiMortgage fell within the safe harbor provisions of §524(j) for two (2) distinct reasons; they were made in response to Mannings' inquires, and more importantly, Manning wanted to retain in their home and avoid *in rem* relief.  *Id.* at 388.

In *In re Bates*, the Debtors, Timothy and Cathy Bates, alleged that Citi violated the discharged injunction by sending a total of seven (7) monthly statements to Bates regarding their discharged mortgage obligation.  517 BR 395, 398 (Bankr. N.H., 2014).  The Court found that Citi's actions fell within the safe harbor provisions of §524(j) due to a combination of two (2) distinct facts.  First, each of the complained of statements included the following disclaimer, in all "capitalized letters in the middle of the first page, immediately under the Plaintiffs' names and address":

> *THIS MORTGAGE ACCOUNT STATEMENT IS FOR INFORMATIONAL PURPOSES ONLY, AS THIS DEBT MAY HAVE BEEN INCLUDED IN A BANKRUPTCY ACTION OR MAY HAVE BEEN DISCHARGED.  THIS IS NOT AN ATTEMPT TO COLLECT, RECOVER, OR OFFSET THE MORTGAGE INDEBTEDNESS AGAINST YOU PERSONALLY.*  Id. at 399.

Secondly, in September, 2009, before the final four (4) complained of statements were even sent, Citi and the Bates entered into a loan modification agreement.  *Id.* at 399-400.  Bates made mortgage payments to Citi under the terms of the loan modification through November, 2010.  *Id.* Bates ultimately stopped making the payments when the learned that Citi was not reporting the payments to the credit reporting bureaus, due to the Bates having not reaffirmed the mortgage obligation in their Chapter 7 Bankruptcy.  *Id.*  This Court found that,

> *Because the Debtor[s] wanted to retain [their] home, the Debtor[s] had every incentive to keep the payments on the mortgage current in order to avoid foreclosure by the Defendant.  As the First Circuit Court of Appeals has explained:  '[A] debtor whose home is at stake is in an unenviable position.  But a Chapter 7 discharge is not a walk in the park; it is 'a benefit that comes with certain costs.'...if the debtor surrenders his home, he is entitled to erase all his debts (secured and unsecured) and start afresh.  If, however, his paramount interest is in keeping his home and he cannot redeem the*

21

*collateral, he must come to terms with the mortgagee. Id.* at 400. (Citing *In re Manning*, 505 BR 383, 387-88 (Bankr. N.H., 2014) quoting *Jamo v. Kathdin Fed. Credit Union*, 283 F.3d 392, 400 (1ˢᵗ Cir., 2002)).

Notably, this Court found that Citi did violate the discharge injunction, when in June 2013, an automated telephone call was made to Bates requesting proof of insurance upon the property, which at that time had been foreclosed over two (2) years prior. *Bates*, 517 BR at 403. The Court found, and the District of New Hampshire Affirmed, that, "Because Citi contacted the Plaintiffs about an obligation that was *either discharged under the note* and/*or* extinguished by foreclosure of the mortgage…the contact by Citi in June of 2013 violated the discharge injunction" and that the safe harbor provisions of §524(j) did not apply. *Id.*; 2016 D.N.H. 026 (D.N.H., February 10, 2016) (*emphasis* added).

In *Best v. Nationstar Mortgage, LLC*, the Debtor, Best, initially filed a Case under Chapter 13, and subsequently converted to a Chapter 7. (1ˢᵗ Cir. B.A.P., 2015) * 2. Prior to converting his case, Best filed two (2) proposed Chapter 13 Plans each containing a statement that, "no assignment of mortgage exists transferring note from GMAC to Nationstar so no debt exists." *Id.* After receiving his discharge in the Chapter 7 Case, Nationstar sent six (6) certified letters to Best. *Id.* at *3. Best argued that the letters sent by Nationstar, "demand[ed] money for this discharged alleged debt that never existed." *Id.* Best argued, that because Nationstar never objected to the plan, when in fact it had, and because it never filed a proof of claim, which in fact it did, that it could not argue after the discharge that the lien existed. *Id.* Best supported his entire claim upon the faulty argument that because he alleged that no valid assignment existed within his unconfirmed plan, the Chapter 7 discharge acted to discharge the "unsecured debt" owed to Nationstar. *Id.* at *5. Ultimately the Court determined that Nationstar did in fact have a valid lien, and as the only element of §524(j) that Best argued was Nationstar's secured status, the post-discharge communications fell within the safe harbor provisions of §524(j). *Id.* At *16.

In *In re Ladebush*, the Debtors, Raymond and Karen Ladebush, filed a Chapter 7 Bankruptcy on March 1, 2011, and indicated an intent to retain their primary residence.  2016 BNH 004 * 2 (Bankr. N.H., 2016).  Despite Ladebushs' stated intent to retain their home the Debtors received a Discharge without having either redeemed or reaffirmed Beneficial's loan.  *Id.* At *3.  After the issuance of the Discharge, Ladenbush attempted to negotiate a loan modification to reduce the principal balance with Beneficial.  *Id.*  Ladenbush, who continued to be represented by Counsel, made clear to Beneficial that if no acceptable agreement could be reached, than Ladenbush intended to dispute the validity of the entire mortgage in order to prevent a foreclosure on their primary residence.  *Id.*  At *4.  Beneficial, after denying Ladenbush Foreclosure Assistance and, having not received any voluntary payments, scheduled a foreclosure sale of the property; Ladenbush filed a petition to enjoin the foreclosure with the Superior Court.  *Id.* At 11.  After considering the statements, and notices complained of by Ladenbush, together with the stated intent to retain the property and the "admitted legal strategy" of Ladenbush, this Court found that Beneficial's actions fell within the safe harbor provisions of §524(j).  *Id.*  At *21-22.

Unlike all of the debtors in *Manning, Bates, Best*, and *Ladenbush*, who all sought in various ways to retain their primary residences after receiving their Chapter 7 Discharges, Todt never intended to retain the property after filing their Chapter 7 Bankruptcy.  As the First Circuit Court of Appeals noted in *Jamo*, a Chapter 7 Debtor may either surrender his or her house, in which case the Debtor is entitled to "erase all his debts (secured and unsecured) and start afresh", or a Debtor may keep his or her home by maintaining mortgage payments.  *Jamo*, 283 F. 3d at 400.

The fact that the Todt continued to reside in the property is irrelevant to determining whether the Todts' surrendered the property; the First Circuit requires only that the Debtor "cede his possessory rights" in the property, it is then wholly within the discretion of the secured creditor "whether [and when] to foreclose" on the property.  *Pratt*, 462 F.3d at 19.  Todt notified Saxon of their inability to maintain the mortgage payments in January, 2008; at which time Todt intended to sell the house and notified Saxon of this intent.  Between January, 2008, and the time Todt

filed Bankruptcy there were at least two (2) pending short-sales; however, Saxon refused to accept any of the offers.  Having no other options, Todt filed for Bankruptcy, knowing that they could not afford to retain their home, that the mortgagee would eventually foreclose, and that they would eventually move.  At no point immediately prior to filing for bankruptcy, during the pendency of the Bankruptcy, or after receiving their Chapter 7 Discharge did Todt express any intent to retain the property.

Todt emphasizes that they do not base any part of their complaint for violation of the Discharge Injunction upon the fact that BONY and/or Ocwen foreclosed, or that BONY and/or Ocwen caused statutorily required notices of the pending foreclosure to be sent to Todt.  Todt freely acknowledges, and admits that the lien was unaffected by the Bankruptcy Discharge, which allowed BONY and/or Ocwen to pursue its *in rem* rights by foreclosing after the Discharge. Todts' complaint asserts that it was the monthly bills seeking to obtain payment upon the discharged debt, the multiple notices sent both prior to and for almost a year after the eventual foreclosure sale, the failure to timely file the foreclosure deed, and failure to accurately report the status of the debt as discharged upon their credit reports which violated the discharge injunction.

BONY and Ocwen are further unable to meet the safe harbor requirement of §524(j) due to the fact that the complained of actions do not fall within the parameters of 11 U.S.C. §524(j)(3). Ocwen did not send the monthly bills to Todt in an attempt to seek periodic payments *in lieu of pursuit of in rem relief to enforce the lien*, as required by §524(j); rather the monthly bills were sent to Todt contemporaneously with BONY and Ocwen's attempts to seek *in rem* relief to enforce the lien.  BONY, by its former counsel, prepared, however never filed a Motion for Relief within two (2) weeks of Todts' Chapter 7 Bankruptcy Petition; on February 23, 2012, less than one (1) month after Todt received their Chapter 7 Discharge, Saxon, by its counsel, resumed preparations to foreclose on the property.  After the "servicing rights" were acquired by Ocwen foreclosure preparations continued, and multiple foreclosure sales were scheduled on the

24

property; when Todt would call to inquire as to whether the foreclosure sale actually occurred, they were repeatedly informed that "paper work issues" prevented the sales.

While in appropriate circumstances, such as those present in *Manning, Bates, Best,* and *Ladenbush*, where a mortgagor not only expresses an intent to retain their primary residence, but also takes affirmative steps to resolve the delinquency after receiving a Chapter 7 Discharge, 11 U.S.C. §524(j) provides an important safe harbor to protect mortgagees from being unwittingly caught in a complaint for violation of the discharge injunction for merely attempting to work with the debtor in obtaining the debtor's goal. However, the shield provided by §524(j) should not be allowed to work as a sword against a debtor who not only neither expresses an intent to retain their primary residence nor takes affirmative steps to resolve the delinquency after receiving a Chapter 7 Discharge, but also has unequivocally notified the mortgagee that they are not able to retain their primary residence.

### C.    Ocwen and BONY's Violations of the Discharge Injunction were Willful

The First Circuit views violations of the Discharge Injunction as analogous to Violations of the Automatic Stay. *In re Pratt*, 462 F.3d at 19. Pursuant to the plain language of 11 U.S.C. §362(k)(1), a debtor is not able to recover damages from violations of the automatic stay unless the violation was willful. While there is no similar code provision contained within 11 U.S.C. §524, the First Circuit recognizes that damages may be awarded for violations of the discharge injunction pursuant to the Bankruptcy Court's power to sanction contempt contained within 11 U.S.C. §105. *Id.* at 20. Attorneys' fees and costs as well as emotional distress damages are deemed compensatory and authorized by §105. *Id.; Fleet Mortgage Group, Inc. v. Kaneb*, 196 F.3d 265, 270 (1st Cir., 1999). Furthermore, punitive damages are "within the sound discretion of the court" and are "appropriate in egregious cases where such an award is necessary to punish and deter the defendant's conduct." *In re Mosher*, 432 BR 472, 477 (Bankr. N.H., 2010); citing

*Federal Home Loan Mortgage Corp. v. McCormack*, 1996 WL 753938 *6 (D.N.H.); *Romano v. U-Haul Int'l*, 233 F. 3d 655, 672 (1st Cir. 2000).

The First Circuit deems a violation of the Discharge Injunction to be willful if (a) the violator knew of the Bankruptcy filing, and (b) intended the action(s) which violated the discharge injunction. *In re Pratt*, 462 F.3d at 19, 21. A finding of willfulness "does not require a specific intent to violate the [discharge injunction]. The violation [] is willful if…the defendant intended the actions which constituted the violation. In cases where the creditor received actual notice of the [discharge], courts must presume that the violation was deliberate." *Mosher*, 432 BR at 476. "Once the creditor receives actual notice, the burden shits to the creditor to prevent violations of the automatic stay." *Kaneb*, 196 F.3d at 269.

In this case, both Saxon and BONY had actual knowledge of Todts' Chapter 7 Bankruptcy filing, and knowledge of the Discharge. Furthermore, Saxon had actual knowledge that Todt intended to surrender the property. Saxon, as the mortgage servicer, was BONY's agent at the time of Todts' Bankruptcy filing. *R. G. Fin. Corp. v. Vergara-Nunez*, 446 F.3d 178, 187 (1st Cir. 2006). Knowledge of the Chapter 7 Bankruptcy and knowledge of the Discharge is imputed to Ocwen as BONY's agent, upon receiving the "servicing" rights to Todts' mortgage from Saxon. Ocwen has admitted to sending each and every one of the bills complained of by Todt. The mailing of billing statements by Ocwen to Todt seeking to collect the discharged debt constitutes an intentional act. *Mosher*, 432 BR at 476. Therefore, each and every one of the twenty-one (21) bills, and the thirteen (13) various letters sent by Ocwen to Todt constitute willful violations of the Discharge injunction. Additionally, while neither the failure to promptly file the foreclosure deed nor the faulty information provided to the credit report bureaus, standing alone may not constitute willful violations, when the totality of the circumstances are taken into consideration, both acts have further frustrated Todts' attempts to move forward, and therefore, have effectively denied Todt their financial fresh start.

### V.        Conclusion

The material facts in this matter are uncontested.  In this case, both Saxon and BONY had actual knowledge of Todts' Chapter 7 Bankruptcy filing, and subsequent discharge.  Todt notified Saxon over three (3) years prior to actually filing their Bankruptcy that they were no longer able to afford the mortgage payments and wished to sell the property, rather than have Saxon foreclose.  After at least two (2) unapproved short sale requests, Todt filed their Chapter 7 Bankruptcy Petition.  After Todt initially notified Saxon of their inability to cure the mortgage arrearages and maintain current mortgage payments, Todt did not indicate to Saxon that either their intentions or their circumstances had changed with respect to the real estate.

Pursuant to the plain language of 11 U.S.C. §524(a)(2), the Defendants' actions violated the Todts' discharge injunction.  11 U.S.C. §524(j) does provide an exception to mortgagees, and servicers, who seek to work with discharged debtors to prevent foreclosure where a debtor expressed an intent to retain their primary residence but failed to reaffirm the debtor or redeem the property.  However, the Defendants cannot claim protection under this provision in this matter, where Todt was not attempting to retain their residence, had expressly indicated not only an intent to surrender, but also an inability to cure their mortgage payments.  Furthermore, all of the complained of bills sent by Ocwen to Todt were sent while Ocwen and or BONY were also proceeding with exercising *in rem* rights with respect to the property.  Thus, the bills complained of were not sent in lieu of pursuit of in rem relief as required by 11 U.S.C. §524(j)(3).

Pursuant to the relevant binding case law, Todt is entitled to Summary Judgment in their favor with respect to the Defendants' liability for the repeated willful violations of the discharge injunction.  Under the well settled case law for the First Circuit, and the District of New Hampshire, Todt is entitled to recover their actual damages, consisting of emotional distress and attorneys' fees and costs incurred as a result of bringing this matter, as well as punitive damages for the Defendants' disregard for Todts' right to receive a financial fresh start.  Accordingly this Honorable Court should schedule an Evidentiary Hearing on the issue of Damages.

**VI.      Requested Relief**

WHEREFORE, the Plaintiffs, Randall G. and Sharon L. Todt, respectfully request this Honorable Court enter Summary Judgment as to liability in favor of the Plaintiffs, Randall G. and Sharon L. Todt, against the Defendants, jointly and severally as follows:

1. Find that Ocwen, BONY and Saxon willfully violated the discharge injunction provided by 11 U.S.C. §524(a)(2); and

2. Schedule an evidentiary hearing on Damages; and

3. For such other relief as may be fair, just and equitable.

<div style="margin-left:50%">

Respectfully Submitted,
Randall G. Todt
Sharon L. Todt
By and through their attorney

</div>

Dated:  April 5, 2016

<div style="margin-left:50%">

/s/ Raymond J. DiLucci, Esq.
Raymond J. DiLucci, Esq.
BNH03206
Raymond J. DiLucci, P.A.
81 South State Street
Concord, NH  03301
Tel: (603) 224-2100

</div>

## **VERIFICATION**

I, Randall G. Todt, being first duly sworn, depose and say as follows:

1. That all facts as set forth in paragraphs 1 through 97, in section "II. Statement of Material Facts" are true and correct to the best of my knowledge, information and belief.

2. That all exhibits attached to this Motion are either original documents, or true and accurate duplicates of original documents to which there are no genuine questions as to authenticity.

Date: March 31, 21016

<div style="margin-left:50%">

/s/ Randall G. Todt_____
Randall G. Todt

</div>

STATE OF NEW HAMPSHIRE
MERRIMACK, SS

Then appeared before me, the undersigned officer, the individuals known or satisfactorily proven to be, Randall G. Todt, who took oath, deposed and swore or affirmed that the herein-contained information is true and correct to the best of his knowledge, information and belief.

Date: March 31, 2016                                    /s/ Raymond J. DiLucci_____
                                                        Notary Public
                                                        My commission expires: March 9, 2021

## <u>VERIFICATION</u>

I, Sharon L. Todt, being first duly sworn, depose and say as follows:

1. That all facts as set forth in paragraphs 1 through 97, in section "II. Statement of Material Facts" are true and correct to the best of my knowledge, information and belief.

2. That all exhibits attached to this Motion are either original documents, or true and accurate duplicates of original documents to which there are no genuine questions as to authenticity.

Date: March 31, 2016                                    /s/ Sharon L. Todt_____
                                                        Sharon L. Todt

STATE OF NEW HAMPSHIRE
MERRIMACK, SS

Then appeared before me, the undersigned officer, the individuals known or satisfactorily proven to be, Sharon L. Todt, who took oath, deposed and swore or affirmed that the herein-contained information is true and correct to the best of her knowledge, information and belief.

Date: March 31, 2016                                    /s/ Raymond J. DiLucci_____
                                                        Notary Public
                                                        My commission expires: March 9, 2021