**2017 BNH 007**

_____

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

In re:                                                                    Bk. No. 11-12617-JMD
                                                                          Chapter 7
Randall G. Todt and
Sharon L. Todt,
                    Debtors

Randall G. Todt and
Sharon L. Todt,
                    Plaintiffs,

v.                                                                        Adv. No. 15-1040-JMD

Ocwen Loan Servicing, LLC,
Saxon Mortgage Services, Inc., and
The Bank of New York Mellon FKA
The Bank of New York, as Successor
Trustee for JPMorgan Chase Bank, N.A.,
as Trustee for Novastar Mortgage
Funding Trust, Series 2005-3,
Series 2005-3 Novastar Home Equity
Loan Asset-Backed Certificates,
Series 2005-3,
                    Defendants

*Raymond J. DiLucci, Esq.*
*Raymond J. DiLucci, P.A.*
*Concord, New Hampshire*
*Attorney for Plaintiffs*

*William J. Amann, Esq.*
*Craig, Deachman & Amann, PLLC*
*Manchester, New Hampshire*
*Attorney for Defendants Ocwen Loan Servicing, LLC and The Bank of New York Mellon*

## <u>MEMORANDUM OPINION</u>

## I.  INTRODUCTION

    Randall and Sharon Todt (the "Debtors") filed for chapter 7 bankruptcy relief in 2011 and

received their bankruptcy discharges in 2012.  After their bankruptcy case was closed, the

Debtors continued to receive monthly statements from their mortgage servicer indicating their mortgage was past due.  The mortgage on their home was eventually foreclosed in 2013.  The Debtors received several additional communications from the mortgage servicer in 2014.  The Debtors reopened their bankruptcy case in 2015 and filed this adversary proceeding against Saxon Mortgage Services, Inc. ("Saxon"), Ocwen Loan Servicing, LLC ("Ocwen"), and The Bank of New York Mellon FKA The Bank of New York, as Successor Trustee for JPMorgan Chase Bank, N.A., as Trustee for Novastar Mortgage Funding Trust, Series 2005-3, Series 2005-3 Novastar Home Equity Loan Asset-Backed Certificates, Series 2005-3 ("BONY" and collectively with Ocwen, the "Defendants"), alleging they willfully violated the discharge injunction set forth in 11 U.S.C. § 524(a)(2).  The Court entered a default against Saxon on August 4, 2015.  On summary judgment, the Court ruled that certain actions taken by Ocwen violated the discharge injunction and did not fall within the safe harbor provision of 11 U.S.C. § 524(j).  The Court held a trial on the outstanding issues on March 9, 2017, and took the matter under advisement.  This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 77.4(a) of the United States District Court for the District of New Hampshire.  This is a core proceeding in accordance with 28 U.S.C. § 157(b).


## II.  FACTS

The Debtors filed a chapter 7 bankruptcy petition on July 1, 2011.  On Schedule A they listed their residence located at 136 Chauncey Street, Manchester, New Hampshire (the "Property") and indicated it was worth $250,000.00.  On Schedule D they listed both BONY and Saxon as creditors holding a security interest in the Property with Saxon being owed

$338,000.00 and BONY being owed $0.  Saxon apparently serviced the loan held by BONY.
The Debtors did not reaffirm the debt secured by the Property.[1]

Mrs. Todt testified at trial that the Debtors had no intention of keeping their house.  At
the time of the Debtors' bankruptcy filing, Mr. Todt had been unemployed for ten years due to
medical issues and Mrs. Todt had been re-employed only for a few months, having been laid off
in 2010 from an administrative position with a financial services company.  By 2011, the
Debtors had been unable to keep up with their mortgage payments for several years.  Back in
2007, the Debtors tried to sell the Property but Saxon would not agree to a sale.  In 2008, they
attempted to refinance their mortgage with a local bank but Saxon was unwilling to write-off
$10,000.00 to permit the refinance to take place.  In 2009, the Debtors attempted a short sale but
Saxon ignored their requests for approval.  Mrs. Todt testified that the Debtors repeatedly asked
Saxon for help but they did not receive it.  Instead, Saxon scheduled several foreclosure sales,
which never took place.

Over time, the Debtors realized they would not be able to keep the Property and so they
sought bankruptcy relief.  Mrs. Todt testified that, by filing bankruptcy, she and her husband
would no longer owe any money on the mortgage debt.  While the mortgage would still exist,
they would not owe any money to the mortgagee, i.e., there would be a "zero balance" as they
would be giving up their financial responsibility for it.  She understood that eventually the
Property would be foreclosed.  Mrs. Todt testified that, in the Debtors' view, the Property was
"really gone" once their bankruptcy discharges entered:  they understood that they no longer had
any ownership interest in the house once they filed bankruptcy as "bankruptcy took the house
away from them."

---

[1]  The Debtors did not list the Property on the Chapter 7 Individual Debtor's Statement of Intention filed
in their bankruptcy case.  Accordingly, they did not indicate any intent to "surrender" or "retain" the
Property.

The Debtors received bankruptcy discharges on January 26, 2012.  The Court served Saxon and BONY[2] with notice of the Debtors' discharges on or about January 28, 2012.  Ex. 9. Shortly, thereafter, on or about March 12, 2012, Saxon sent the Debtors a notice advising them that the servicing of their mortgage would be transferred from Saxon to Ocwen effective April 2, 2012.  Ex. 13.

From April 12, 2012, through December 17, 2013, Ocwen sent the Debtors twenty-one monthly statements indicating their mortgage with BONY was past due.  Exs. 15-24, 26, 29, 31, 34, 36, 39-41, 43, 45-46.  The statements were nearly identical, except the total amount due increased from $140,574.80 on the first statement to $199,872.83 on the last statement.  Each statement listed a "Current Amount Due," which consisted of principal, interest, and escrow for the current month and ranged from $2,745.91 on the first statement to $2,745.92 on the last statement.  Each statement also listed "Past Due Amounts DUE IMMEDIATELY," which also consisted of principal, interest, and escrow and ranged from $118,074.13 on the first statement to $172,992.37 on the last statement.  Each statement further contained an amount for "Total Fees/Expenses Outstanding," which consisted of late charges, prior servicer fees, property inspection fees, and foreclosure and other miscellaneous fees and ranged from $19,754.76 on the first statement to $24,134.54 on the last statement.   Each statement also contained a detachable payment coupon that listed the "AMOUNT DUE" as the total amount due consisting of both the current amount due and the past amount due, which ranged from $140,574.80 to $199,872.83, as noted above.

Each of the statements contained bankruptcy disclaimer language on the front in a section labeled, "Important Messages," which provided:

---

[2]  Service on BONY was in care of its attorneys.

> If you are currently in bankruptcy or if you have filed for bankruptcy since obtaining this loan, please read the bankruptcy information provided on the back of this statement.

On the back of the statement, in a section labeled, "IMPORTANT BANRKUPTCY INFORMATION," it provided:

> If you or your account are subject to a pending bankruptcy or the obligation referenced in this statement has been discharged in bankruptcy, this statement is for informational purposes only and is not an attempt to collect a debt.

> If you have questions regarding this statement, or do not want Ocwen to send you monthly statements in the future, please contact us at 1-888-554-6599.  Bankruptcy payments from the Trustee should be mailed to Ocwen Loan Servicing, LLC, P.O. Box 24781, West Palm Beach, FL 33416-4781.

See, e.g., Ex. 15.  The monthly statements further noted in the "Important Messages" section that "Our records indicate that your loan is in foreclosure.  Accordingly, this statement may be for informational purposes only."  See id.

Mrs. Todt testified that she called Ocwen to question why they were receiving monthly statements.  A representative told her that he could see the Debtors' bankruptcy filing and the bankruptcy discharge in Ocwen's records; the representative told Mrs. Todt that the Debtors should "just ignore" the statements.  Mrs. Todt testified that it was upsetting to receive these statements each month since Ocwen had "no right" to send them these bills.  She stated that she was constantly worried whether Ocwen would come after them for money, including the difference between what was owed and what Ocwen might receive at a foreclosure sale.  At trial, Mrs. Todt indicated that she never read the bankruptcy disclaimer language contained in the statements, focusing instead on the amounts set forth in the statements.

On March 16, 2013, the Debtors received a letter from Ocwen indicating a foreclosure sale had been scheduled on the Property.  Ex. 27.  It encouraged the Debtors to contact Ocwen to discuss possible alternatives to save their home.  Shortly thereafter, the Debtors received an official "Notice of Mortgage Foreclosure Sale," from BONY's attorneys, which was sent in

accordance with the provisions of NH RSA 479:25 and which advised the Debtors that their home would be sold at a public auction on April 10, 2013, at 3:00 p.m.

For reasons that are not clear from the record, the Property was not foreclosed on April 10, 2013. Instead, Ocwen continued to send the Debtors monthly statements showing more than $148,000.00 "past due" as well as letters indicating it "may not be too late to save [their home]," and notices advising the Debtors of an interest rate/payment change. Exs. 32-34, 36, 37, and 38-43. Mrs. Todt testified that she was worried that Ocwen would come after them for the money listed in the statements. She indicated her husband was just as upset as she was by the statements.

The Debtors were sent a second "Notice of Mortgage Foreclosure Sale" on or about November 14, 2013. Ex. 44. This notice informed the Debtors that a foreclosure auction would take place on December 16, 2013, at 12:00 p.m. Within a few days, on November 18, 2013, Ocwen sent the Debtors another monthly statement. Ex. 45.

The mortgage on the Debtors' home was foreclosed on December 16, 2013. Nonetheless, Ocwen sent the Debtors another monthly statement on December 17, 2013. Ex. 46. A foreclosure deed was executed on January 14, 2014; it shows that BONY bought the property for $285,000.00. Ex. 47. Another foreclosure deed was executed on March 26, 2014; it too indicates that BONY bought the property for $285,000.00. Ex. 50. A third foreclosure deed was executed on November 7, 2014, also showing a sale to BONY for $285,000.00. Ex. 58. This third foreclosure deed was the one recorded with the Hillsborough County Registry of Deeds on December 8, 2014.[3] Id.

---

[3] The parties did not explain during trial why three separate foreclosure deeds were executed or why there was such a delay in recording the foreclosure deed. While the deed was recorded in December 2014, Mrs. Todt testified that the Debtors did not vacate the Property until September 2015. Mrs. Todt further testified that the Debtors paid nothing for the Property from the date they filed bankruptcy on July 1,

The Debtors received several additional communications from Ocwen after the foreclosure sale.  Specifically, the Debtors received a letter from Ocwen dated September 9, 2014, notifying them that a relationship manager had been assigned to them and would be "assisting in identifying solutions for their mortgage."  The letter expressly stated that "[t]his communication is from a debt collector attempting to collect a debt."  Ex. 53.  On September 26, 2014, Ocwen sent the Debtors a letter informing them that their hazard insurance policy had expired and that Ocwen would be buying insurance for the Property for which the Debtors "must pay" Ocwen.  Ex. 54.  Mrs. Todt was upset by this as she believed legally she could not insure a house she did not own.  She called her insurance company and asked them to contact Ocwen and inform Ocwen that they no longer owned the Property.

On October 16, 2014, Ocwen sent the Debtors an annual escrow account disclosure statement detailing actual and scheduled activity in the Debtors' escrow account between October 2008 and November 2014.   Ex. 55.  This statement also indicated that "[t]his communication is from a debt collector attempting to collect a debt."  The statement also included an "Escrow Shortage Payment" coupon seeking a payment of $2,435.66 from the Debtors.  On October 26, 2014, Ocwen sent the Debtors a second letter informing them that if they failed to provide proof of insurance to Ocwen, it would purchase a policy and the Debtors would be responsible for reimbursing Ocwen for its cost, which Ocwen estimated to be $2,413.00.  Ex. 56.  On December 23, 2014, Ocwen sent another escrow analysis statement notification to the Debtors informing them that the earlier escrow analysis was sent in error and that "[c]urrent monthly payments should continue to be made until Ocwen provides a new escrow analysis."  Ex. 59.

---

2011, through September 1, 2015, i.e., they did not make any payments to Ocwen, they did not pay for any home insurance, and they did not pay any real estate taxes (which amounted to about $6,000.00/year).

Apparently in an attempt to stop Ocwen's continuing communications and requests for payment, the Debtors reached out to the New Hampshire Banking Department, who in turn contacted Ocwen on their behalf.  Ocwen acknowledged in a letter to the New Hampshire Banking Department dated November 17, 2014, that "[u]nfortunately, Ocwen inadvertently failed to update the loan records accordingly" after the foreclosure sale took place on December 16, 2013, "and as a result the loan was reflecting in active status, which in turn caused the system to issue modification solicitation letters to the Todt's."  Ex. 57.  It advised that "Ocwen has updated their records accordingly."  Id.  Notwithstanding Ocwen's statement that it had updated its records, Ocwen sent the Debtors the escrow analysis statement notification dated December 23, 2014.  Ex. 59.

On April 24, 2014, Mrs. Todt obtained her credit report from two different credit reporting agencies.  Both reports reflected a balance of $0 being owed on the mortgage and further indicated that the debt was "included in bankruptcy" and "Discharged through Bankruptcy Chapter 7."  Exs. 51 and 52.  On March 27, 2015, Mr. Todt obtained his credit report from a credit reporting agency and it reflected a balance of $0 on the mortgage.  Ex. 60.  On March 28, 2015, Mrs. Todt obtained a credit report from a personal finance website (not one of the three major credit reporting agencies, i.e., Equifax, Experian, and TransUnion), and it showed a balance of $313,432.00 being owed to Ocwen on the mortgage.  Ex. 61.

On June 19, 2015, the Debtors reopened their bankruptcy case and filed this adversary proceeding.  Saxon did not appear or file an answer and so it was defaulted on August 8, 2015.  The Court declined to enter default judgment against Saxon at that time because the complaint and the motion for default judgment did "not establish that Saxon violated the discharge injunction and [did] not establish any basis for awarding damages [since] [t]he communications

and activities about which the Debtors complain appear to have taken place after Saxon transferred its servicing rights to Ocwen."

On June 8, 2016, the Court granted in part and denied in part the Debtors' motion for summary judgment, ruling specifically that the letters and statements sent between September 9, 2014, and December 23, 2014, described above, "violated the discharge injunction of 11 U.S.C. § 524(a)(2) and did not fall within the safe harbor provision of 11 U.S.C. § 524(j) as these actions all occurred after the mortgage on the Debtors' residence was foreclosed on December 16, 2013." See Exs. 53-56 and 59.

The Court held a trial on March 9, 2017, in order to determine whether any other actions by Ocwen and BONY violated the discharge injunction and whether the Debtors are entitled to damages. Mr. Todt was unable to testify due to his ongoing medical issues. Mrs. Todt testified as did one of her health care providers and a former co-worker.

The health care provider testified that she has seen Mrs. Todt on an annual basis since 2005 and that starting three or four years ago (so starting in 2013 or 2014) Mrs. Todt reported that she was feeling stressed, was teary, and was having difficulty sleeping. She further told her provider that her husband was ill, that she was the only one working, and that the Debtors were having financial issues and were concerned about losing their home and being out on the street.

Mrs. Todt's co-worker testified that she and the Debtor worked together, speaking on a daily basis, for a five-year period from 2011 through 2016. She observed that Mrs. Todt was emotionally upset and cried often at work. The co-worker indicated that the crying started gradually over time, probably starting in 2014 and 2015, and that she (and other co-workers) noticed it, with consistent crying occurring during the last six months of 2016. She testified that Mrs. Todt was often distraught at work and that her issues escalated over time. She indicated that Mrs. Todt informed her that she was experiencing financial difficulties, had filed

bankruptcy, and was feeling pressure from her mortgagee.  She testified that Mrs. Todt was afraid someone would come to her home and lock her out.

Ocwen and BONY did not present any witness testimony at trial, the Court having granted the Debtors' motion in limine prior to trial barring testimony by Ocwen's only proposed witness.


## III.  DISCUSSION

### A.  Legal Analysis

Generally a bankruptcy discharge relieves a debtor from all personal liability for prepetition debt.  Bessette v. Avco Fin. Servs., Inc., 230 F.3d 439, 444 (1st Cir. 2000).  Section 524(a)(2) of the Bankruptcy Code acts as an injunction prohibiting acts "to collect, recover or offset" debts that were discharged in a bankruptcy proceeding personally from the debtor.  11 U.S.C. § 524(a)(2); see Bates v. CitiMortgage, Inc., 844 F.3d 300, 304 (1st Cir. 2016) (citing Canning v. Beneficial Me., Inc. (In re Canning), 706 F.3d 64, 69 (1st Cir. 2013)).  "The discharge injunction embodies the fresh start policy of the Bankruptcy Code, by which honest but unfortunate debtors are relieved of personal liability for their discharged debts."  Best v. Nationstar Mortg., LLC (In re Best), 540 B.R. 1, 8 (B.A.P. 1st Cir. 2015) (internal quotations and citations omitted).  The discharge injunction does not prohibit every communication between a creditor and a debtor; "demands for payment of discharged debts are prohibited."  In re Brown, 481 B.R. 351, 368 n.10 (Bankr. W.D. Pa. 2012) (quoted in Best, 540 B.R. at 10); see also In re Gill, 529 B.R. 31, 37 (Bankr. W.D.N.Y. 2015) (cited in Best, 540 B.R. at 9).

"To prove a discharge injunction violation, a debtor must establish that the creditor '(1) has notice of the debtor's discharge … ; (2) intends the actions which constituted the violation; and (3) acts in a way that improperly coerces or harasses the debtor.'"  Bates, 844 F.3d at 304

(quoting Lumb v. Cimenian (In re Lumb), 401 B.R. 1, 6 (B.A.P. 1st Cir. 2009)). The scope of the discharge injunction is "broad," Canning, 706 F.3d at 69, and bankruptcy courts may enforce it through their "statutory contempt powers" under 11 U.S.C. § 105(a), which "inherently include the ability to sanction a party," see Ameriquest Mortg. Co. v. Nosek (In re Nosek), 544 F.3d 34, 43-44 (1st Cir. 2008); Bessette, 230 F.3d at 445 (1st Cir. 2000) ("[A] bankruptcy court is authorized to invoke § 105 to enforce the discharge injunction imposed by § 524 and order damages … if the merits so require."). Monetary sanctions for violation of the discharge injunction include "actual damages, attorney's fees, or even punitive damages." Robbins v. Walter E. Jock Oil, Co., Inc. (In re Robbins), Bk. No. 14-11166-BAH, Adv. No. 16-1046-BAH, 2017 WL 946282, at *2 (Bankr. D.N.H. Mar. 9, 2017) (citing Bessette, 230 F.3d at 445). And, actual damages may include compensation for "sustained emotional injury" that is attributable to a violation of the discharge injunction. United States v. Rivera Torres, 309 B.R. 643, 649-50 (B.A.P. 1st Cir. 2004), rev'd and remanded on other grounds, 432 F.3d 20 (1st Cir. 2005) (holding the United States was immune pursuant to 11 U.S.C. § 106(a) from an award of emotional distress damages as a contempt sanction under 11 U.S.C. § 105 for violation of the discharge injunction); see also In re A.G. Wassem, 456 B.R. 566, 572 (Bankr. M.D. Fla. 2009) ("Emotional distress constitutes actual damages."). Sanctions imposed for violation of the discharge injunction are in the nature of civil contempt. Canning, 706 F.3d at 69.

When deciding whether the discharge injunction has been violated, courts must decide "whether conduct is improperly coercive or harassing under an objective standard—the debtor's subjective feeling of coercion or harassment is not enough." Bates, 844 F.3d at 304 (citing Lumb, 401 B.R. at 6; Pratt v. Gen. Motors Acceptance Corp. (In re Pratt), 462 F.3d 14, 19 (1st Cir. 2006)). Courts do not employ a "specific test" to determine whether a creditor's conduct meets this objective standard; rather, courts must consider "the facts and circumstances of each

11

case, including factors such as the 'immediateness of any threatened action and the context in which a statement is made.'" Bates, 844 F.3d at 304 (quoting Diamond v. Premier Capital, Inc. (In re Diamond), 346 F.3d 224, 227 (1st Cir. 2003)).  "[A] creditor violates the discharge injunction only if it acts to collect or enforce a prepetition debt; bad acts that do not have a coercive effect on the debtor do not violate the discharge." Lumb, 401 B.R. at 7 (quoted in Bates, 844 F.3d at 304).  Statements that are informational in nature, even if they include a payoff amount, generally are not actionable if they do not demand payment.  Bates, 844 F.3d at 304 (citing Best, 540 B.R. at 11).  In addition, letters that mention potential foreclosure after bankruptcy also are not actionable if they do not threaten any immediate action against the debtors.  Bates, 844 F.3d at 304 (citing Jamo v. Katahdin Fed. Credit Union (In re Jamo), 283 F.3d 392, 402 (1st Cir. 2002)).  The burden of proof is on the debtor to establish by clear and convincing evidence that the creditor violated the discharge injunction.  Best, 540 B.R. at 9 (citing Manning v. CitiMortgage, Inc. (In re Manning), 505 B.R. 383, 386 (Bankr. D.N.H. 2014)); In re Zine, 521 B.R. 31, 38 (Bankr. D. Mass. 2014).

It is worth noting that "the discharge injunction does not prohibit a secured creditor from enforcing a valid prepetition mortgage lien." Best, 540 B.R. at 9.  "[A] discharge merely releases a debtor from personal liability on the discharged debt; when a creditor holds a mortgage lien or other interest to secure the debt, the creditor's rights in the collateral, such as foreclosure rights survive or pass through the bankruptcy." In re Reuss, No. DT-07-05279, 2001 WL 1522333, at *2 (Bankr. W.D. Mich. April 12, 2011) (quoted in Best, 540 B.R. at 9).  Thus, secured creditors may take appropriate action to enforce a valid lien surviving discharge, as long as the creditor does not seek to hold the debtor personally liable for the debt.  Best, 540 B.R. at 9.

"In addition, § 524(j) [of the Bankruptcy Code] provides an exception to the discharge injunction for creditors who hold claims secured by the debtor's principal residence as long as

the creditor's acts are in the ordinary course of business between the debtor and the creditor, and limited to seeking payments in lieu of in rem relief."  Id.  Specifically, 11 U.S.C. § 524(j) provides:

> Subsection (a)(2) does not operate as an injunction against an act by a creditor that is the holder of a secured claim, if—
>
> > (1) such creditor retains a security interest in real property that is the principal residence of the debtor;
> >
> > (2) such act is in the ordinary course of business between the creditor and the debtor; and
> >
> > (3) such act is limited to seeking or obtaining periodic payments associated with a valid security interest in lieu of pursuit of in rem relief to enforce the lien.

11 U.S.C. § 524(j).  The requirements are conjunctive, meaning that all must be satisfied for the exception to apply.  Best, 540 B.R. at 10.

### B.  Analysis

#### 1.  Violations

Ocwen and BONY[4] do not challenge the first and second findings that the Court must make in determining whether they have violated the discharge injunction, i.e., they do not dispute that (1) they had notice of the Debtors' bankruptcy discharge; and (2) they intended the actions that constitute the alleged violations, i.e., that Ocwen sent various statements and letters

---

[4] The parties did not make any distinction between BONY and Ocwen at trial.  From the record, it appears that BONY held the claim against the Debtors in the form of a promissory note secured by a mortgage on the Property and Ocwen serviced BONY's note and mortgage.  The record shows that BONY took no direct action against the Debtors; rather, all letters and statements were sent by Ocwen, its agent.  BONY has not challenged the notion that it can be held liable for damages based on its agent's violation of the discharge injunction.  See Pague v. Harshman (In re Pague), Bk. No. 3:01-bk-32061, Adv. No. 3:09-ap-00071, 2010 WL 1416120, *6 (Bankr. N.D. W. Va. Apr. 5, 2010) ("The general rule of respondeat superior … provides that a principal is liable for the wrongful acts of its agent within the scope of the agent's authority.  The agent and principal may be held jointly and severally liable for the wrongful acts of the agent.  No requirement exists that an [agent] must also be a creditor for that [agent] to be held accountable for violations of the discharge injunction." (citations omitted)).

to the Debtors.  At issue then is whether the actions taken by Ocwen satisfy the third element, i.e., whether they were "objectively coercive creditor collection actions."  <u>Bates</u>, 844 F.3d at 305.

### a.  Monthly Statements

Ocwen began sending the Debtors monthly statements in April 2012, a few months after the Debtors received their discharges.  Unlike some statements sent by mortgage companies, Ocwen's statements clearly demand payment from the Debtors. [5] [6]  As the Court has previously indicated, "[a]cts in the ordinary course of business in furtherance of collection of periodic payments associated with a valid mortgage on a personal residence are expressly permitted under the Bankruptcy Code."  <u>Bates</u>, 517 B.R. 395, 399 (Bankr. D.N.H. 2014) (citing 11 U.S.C. § 524(j)), <u>aff'd</u>, 550 B.R. 12 (D.N.H. 2016), <u>aff'd</u>, 844 F.3d 300 (1st Cir. 2016).  However, § 524(j)(3) requires that (1) the request be for "periodic payments," and (2) be "in lieu of pursuit of in rem relief to enforce the lien."  11 U.S.C. § 524(j)(3).  The record in this case shows that Ocwen's statements did not satisfy these requirements and therefore Ocwen was not protected by § 524(j)'s exception to the discharge injunction.

---

[5] For example, in the case of <u>Lemieux v. America's Servicing Co. (In re Lemieux)</u>, 520 B.R. 361, 366 (Bankr. D. Mass. 2014), the monthly statements sent to the debtors omitted "the word 'due,' a word that indicates an attempt to collect a debt" and the detachable coupon had "blank lines that a borrower might fill in to indicate a monthly payment amount, additional principal, late charges and additional escrow."  The payment coupons also included additional language stating:  "*If you are currently a party in a bankruptcy case, and you choose to make a voluntary payment, detach and return the remittance coupon with your payment.*"  <u>Id.</u> at 365 (emphasis in original).  In <u>McConnie Navarro v. Banco Popular de Puerto Rico (In re McConnie Navarro)</u>, 563 B.R. 127, 146-47 (Bankr. D.P.R. 2017), the "mortgage statements did not include the amount of payment, a due date, a late charge if not received by a date certain, or a past due amount and included a disclaimer."  In addition, the monthly payment coupon did not include amounts for "the monthly payment, additional principal, additional escrow, late fees and other" but rather they were "all left blank."

[6] Ocwen argues that its statements contain bankruptcy disclaimer language that indicates the statements were being sent for "informational purposes only."  In the Court's view, "[a] creditor cannot avoid the consequences of violating the automatic stay or discharge injunction simply by burying an alternative explanation for a clear demand for payment in fine print."  <u>Zine</u>, 521 B.R. at 540.  "[D]isclaimer language may not be used to shield an improper demand for payment should there be one."  <u>McConnie Navarro</u>, 563 B.R. at 149.

First, the monthly statements indicate, from the time that Ocwen first started sending statements in April 2012, that the Debtors' loan was "in foreclosure."  For that reason, it would appear that Ocwen and BONY were pursuing in rem relief from as early as April 2012.  There is no doubt that by March 2013, when BONY's attorneys sent the Debtors the statutorily required "Notice of Foreclosure Sale," Ex. 28, they were seeking in rem relief.  Accordingly, the monthly statements could not have been sent in "in lieu of pursuit of in rem relief."

Second, the monthly statements do not show that Ocwen was seeking only "periodic payments" from the Debtors but instead they show that Ocwen was seeking payment of all past due amounts.  Between April 12, 2012, and March 18, 2013, Ocwen sent the Debtors twelve monthly statements.  Each of those statements was substantively identical except for the total amount due, which increased incrementally with each successive statement.  These statements did not reflect that the Debtors had received a bankruptcy discharge on January 26, 2012, a fact that Ocwen does not dispute and admitted to the Debtors in one or more telephone communications.  Instead, the statements only contain a boilerplate notice on the front indicating that the recipient should read a provision on the back if the recipient were in bankruptcy.  The back of the monthly statements included a sentence noting that if the recipient were in bankruptcy, or had been discharged in bankruptcy, the monthly statement was for informational purposes only and was not an attempt to collect a debt.  Thus, Ocwen's monthly statements did not reflect any real recognition by Ocwen that the Debtors' bankruptcy discharges had entered and that, accordingly, both the content of Ocwen's monthly statements and the demands that Ocwen could make therein should have been affected.

In addition, after Ocwen noticed the foreclosure sale in March 2013 (and clearly began pursuing in rem rights under BONY's mortgage), Ocwen continued to send the same form of notice demanding payment.  After the foreclosure on December 16, 2013, Ocwen sent an

additional monthly statement as well as letters regarding hazard insurance for the property, an

offer to attempt to resolve mortgage problems, and annual escrow statements.  Not all of the

post-foreclosure communications contained prominent bankruptcy disclaimer language.

Ocwen defends its actions on the grounds that the monthly statements sent post-discharge

include bankruptcy disclaimer language; however, this elevates form over substance.  The

totality of Ocwen's communications on and after April 12, 2012, with the exception of

communications in connection with the enforcement of its in rem rights under the mortgage,

reflected no recognition of the issuance of the bankruptcy discharge.  All such communications

expressly and implicitly reflect attempts to collect discharged obligations from the Debtors.  No

pro forma bankruptcy disclaimer can overcome the effects of repeated and continuous

communications in which Ocwen took the position that these obligations were collectible.  The

use of a pro forma bankruptcy disclaimer is not a "get out of jail free" card that can absolve a

creditor of liability for a pattern of conduct that is inconsistent with the terms of the disclaimer

itself.  Accordingly, the Court finds that the twenty-one monthly statements sent between April

2012 and December 2013 improperly coerced and harassed the Debtors in violation of the

discharge injunction.

### b.  Post-Foreclosure Letters

The Court previously ruled on summary judgment that Ocwen's post-foreclosure

communications were not protected by § 524(j) and violated the discharge injunction.  Thus,

Ocwen's and BONY's argument in their post-trial memorandum that these communications were

not coercive is misplaced; the Court has already concluded that they were coercive and

harassing.  The letters Ocwen sent to the Debtors informed them that (1) they needed to provide

Ocwen with evidence of hazard insurance or they would be required to reimburse Ocwen

approximately $2,413.00 for its purchase of a hazard insurance policy;[7] and (2) an updated escrow analysis had been completed and an escrow shortage payment of $2,435.66 should be made and current monthly payments should continue.  The last of the five communications informed the Debtors that they had a relationship manager who would help them identify "solutions for their mortgage," a mortgage which already had been extinguished.

At the time Ocwen sent these five communications to the Debtors, the Debtors had no personal liability on the note, and BONY had already obtained ownership of the Property through foreclosure.  The Bankruptcy Code prohibits a party that has "no contractual or *in rem* relationship with a discharged debtor" from sending the debtor letters based on a relationship that no longer exists.[8]  Collins v. Wealthbridge Mortg. Corp. (In re Collins), 474 B.R. 317, 321 (Bankr. D. Me. 2012).  "[P]urposeless letters relating to past debts and obligations constitute harassment proscribed by the discharge injunction."  Id.

### c.  Credit Reporting

"Reporting false or outdated information to a credit agency in an attempt to coerce payment on a discharged debt can violate the discharge injunction. . . .  The reason:  negative credit reports have consequences—like reducing creditworthiness, and with it the debtor's ability to get loans in the future—and so a false report might coerce a debtor into paying a discharged debt to avoid those consequences. . . .  Evidence that a creditor refused to change a false or outdated report can give rise to an inference that the creditor intended to coerce the debtor into

---

[7]  As a result of their discharge, the Debtors had no obligation to obtain hazard insurance on the Property. Lemieux, 520 B.R. at 367 n.5.

[8]  The Court notes that the letters Ocwen sent to the Debtors relate to obligations that arose under the note and mortgage documents, i.e., expenses for insurance and escrow related to preserving the Property. They did not relate to the Debtors' continued occupation of the Property for which it may have been appropriate for Ocwen and/or BONY to contact the Debtors.

paying the discharged debt." Bates, 844 F.3d at 306 (citing Zine, 521 B.R. at 40; Torres v. Chase Bank USA, N.A. (In re Torres), 367 B.R. 478, 486 (Bankr. S.D.N.Y. 2007)).

The Debtors state that the credit reporting on their mortgage was accurate in 2014, but in 2015, that reporting was negative.  Upon review by the Court, it appears that Mr. Todt's credit report accurately reflected a balance of $0 being owed on the mortgage in 2015 but Mrs. Todt's report inaccurately reflected a balance of $313,432.00 being owed to Ocwen.  The Court notes that the inaccurate report was not generated by one of the three major credit reporting agencies but instead by a different online company.  The Debtors did not provide any evidence that would prove that Ocwen was the source of this inaccurate information.  Furthermore, the Debtors have not demonstrated that false information was given in an attempt to coerce the Debtors into making payment on a discharged debt.  For these reasons, the Court cannot find that negative credit reporting constituted a violation of the discharge injunction by the Defendants.

### 2.  Damages

Sanctions for violating the discharge injunction may include the payment of actual damages, including those for emotional distress, attorney's fees, and punitive damages.  Robbins, 2017 WL 946282, at *2.  The Debtors contend all three should be awarded in this case.

### a.  Actual Damages

The Debtors did not present evidence that they suffered any out-of-pocket expenses related to Ocwen's violation of the discharge injunction.  Instead, the Debtors focus on the emotional distress they suffered on account of their receipt of the monthly statements and post-foreclosure communications from Ocwen.  At trial, Mrs. Todt testified about the impact that Ocwen's post-discharge communications had on her and her husband.  She testified that she and her husband were each "a wreck" and they worried that the Defendants "were going to come after [them] because [they] kept getting these statements."  Mrs. Todt indicated that she lost

sleep and received a prescription for "anti-anxiety medication."  She stated she was crying at work and looked "stupid" for crying at work "in front of co-workers."  She felt she could not explain what was happening because she did not want to have to "tell everybody in the world" about the bankruptcy.  Mrs. Todt further indicated that she was stressed, losing work, and was having difficulty concentrating, especially with respect to "details," which was important in her job as an administrative assistant.  Mrs. Todt further testified that "every single month for years this went on."

Mrs. Todt's testimony was corroborated by the testimony of her health care provider who indicated that Mrs. Todt was feeling stressed, was teary, and was having difficulty sleeping back in 2013 and 2014, which was during the time Ocwen improperly was sending the Debtors statements and letters concerning the debt on the Property.  She testified that Mrs. Todt informed her that she was having financial issues and was concerned about losing her home and being out on the street.

Mrs. Todt's testimony was also corroborated by the testimony of a co-worker who also observed Mrs. Todt being upset at work during 2014.  The co-worker testified that Mrs. Todt informed her that she was experiencing financial difficulties, had filed bankruptcy, and was feeling pressure from her mortgagee.

Emotional distress or anxiety arising from a debtor's financial condition, or the filing of a bankruptcy petition, is not grounds for an award of damages where there is a violation of the discharge injunction.  "Damages for emotional distress are proper where the debtor clearly establishes that he or she suffered significant harm and demonstrates a causal connection between that significant harm and the willful violation of the discharge injunction."  McLean v. Greenpoint Credit LLC, 515 B.R. 841, 848 (M.D. Ala. 2014).  "Emotional harm must be significant; fleeting or trivial anxiety or distress is not sufficient."  Id. at 849.  "There are several

ways a debtor can clearly establish significant emotional harm, including but not limited to offering corroborating medical evidence, offering corroborating non-expert testimony, showing the violator engaged in egregious conduct, or testifying (without corroboration) about circumstances in which a reasonable person would obviously suffer significant emotional harm." Id.

The Debtors have presented sufficient evidence that they suffered severe emotional distress due to Ocwen's post-discharge coercion and harassment of them, seeking payments from the Debtors after their personal liability was discharged and their home was foreclosed. Accordingly, the Court will award $500.00 in damages for each violation of the discharge injunction to compensate the Debtors for the real emotional distress they suffered that negatively affected their quality of life from April 2012 through the date of their last communication with the Debtors in December 2014. Those communications include twenty-one monthly statements, the offer to solve "mortgage problems" dated September 9, 2014, the demand for insurance dated September 26, 2014, the annual escrow statement and "Escrow Shortage Payment" coupon dated October 16, 2014, the second demand for hazard insurance dated October 26, 2014, and the escrow analysis statement dated December 23, 2014. The total damages awarded for these twenty-six communications shall be $13,000.00 ($500.00 x 26).

### b. Attorney's Fees

"Bankruptcy courts have routinely awarded attorneys' fees as a sanction against a party that violates the discharge injunction upon a finding of contempt." In re Meyers, 344 B.R. 61, 68 (Bankr. E.D. Pa. 2006). In awarding attorney's fees, the Court applies a lodestar analysis, which requires the Court to take the product of a reasonable hourly rate and the number of hours productively spent. Robbins, 2017 WL 946282, at *3 (citing Berliner v. Pappalardo (In re Sullivan), 674 F.3d 65, 69 (1st Cir. 2012)). Then, the Court may adjust this amount based on a

number of factors including:  (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.  Robbins, 2017 WL 946282, at *3 n.6 (citing Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 718 (5th Cir. 1974)).

The Debtors' law firm has performed services for the Debtors for a total fee of $45,254.75, which consists of 317.89 hours at an average rate of $142.36 per hour.[9]  In addition, due to Debtors' counsel's illness, the Debtors were required to obtain the services of another law firm to cover a hearing on the Debtors' motion in limine.  That attorney's fees total $4,195.00; the Court has not been provided any breakdown for that amount in terms of hours or rate.  In total, the Debtors seek to recover $49,449.75 in attorney's fees.

The Court finds that the rates charged by the Debtors' law firm are reasonable.  However, the Court cannot find that all of the hours spent by Debtors' counsel to pursue this action were productive or reasonable.  For example, upon a review of the invoice provided to the Court, it appears counsel spent nearly forty hours on the complaint in this adversary proceeding, both conferencing with the Debtors in connection with the complaint and preparing and filing the actual pleading.  The Court finds those hours to be excessive.  In addition, counsel spent nearly eight hours on a three page motion for default judgment, both discussing the matter with the Debtors and drafting and filing the motion.  Again, the Court finds those hours to be excessive.

---

[9]  Counsel bills his services at the rate of $250.00 per hour and his paralegals' services at the rate of $100.00 per hour.

Overall, counsel spent nearly forty hours conferencing with the Debtors, not including time spent preparing for depositions or trial testimony. The Court notes further that for most of these meetings both the Debtors' attorney and his paralegal attended, essentially duplicating effort.

Because the Court cannot assess the fees of substitute counsel under the lodestar method given the record before it and because, additionally, the Court finds that the Defendants should not have to pay for time spent getting additional counsel up to speed due to Debtors' counsel's illness, the Court will not award the Debtors the fees charged by substitute counsel. Further, because the billing records show a lot of duplicative effort between Debtors' counsel and his paralegals and because the billing records show that overall excessive time was spent on routine tasks, the Court shall award fees for 200 hours at $150.00 per hour, or $30,000.00, as reasonable and necessary.

The billing records reflect that $1,077.07 was incurred in expenses, mostly for photocopies and travel expenses. The Court finds this amount reasonable and necessary and will include it as part of the damage award for the Defendants' violation of the discharge injunction.

### c.  Punitive Damages

The Court has explained in the context of stay violation cases that an award of punitive damages is "within the sound discretion of the court" and may be awarded when a defendant's conduct is "malicious, wanton, or oppressive." Mosher v. Evergreen Mgmt., Inc. (In re Mosher), 432 B.R. 472, 477 (Bankr. D.N.H. 2010); Sherkanowski v. GMAC Mortg. Corp. (In re Sherkanowski), Bk. No. 99-12204-JMD, Adv. No. 11-1008-JMD, 2000 WL 33679425, at *8 (Bankr. D.N.H. Aug. 15, 2000). While the Court is concerned that Ocwen pursued the Debtors after it commenced foreclosure proceedings and even after the foreclosure sale took place, the Court concludes that punitive damages are not necessary under the circumstances of this case. In making that determination the Court considers the fact that the Debtors did not pay any expenses

related to the Property from the date they filed bankruptcy through the date they vacated the premises.  Accordingly, from July 1, 2011, through September 1, 2015, they did not make any mortgage payments, they did not pay for any home insurance, they did not pay any real estate taxes, and they did not pay any rent for use of the Property.  Thus, for a period of fifty-one months, the Debtors had no housing expenses other than the payments for their utilities.  This amounted to an incredible savings for the Debtors, probably on the magnitude of more than $100,000.00.[10]  Instead, the Defendants had to pay some of these expenses.  To order the Defendants to pay punitive damages would result in an additional benefit to the Debtors that is not warranted under the facts of this case.

## IV.  CONCLUSION

The Debtors deserved "a fresh start without being harassed by their former creditor."  Collins, 474 B.R. at 322.  Unfortunately, that did not happen in this case.  Instead, the Debtors continued to receive monthly statements requesting payment even after the Defendants commenced foreclosure proceedings to recover the Property.  Even more surprising is that Ocwen continued to contact the Debtors requesting payment of escrow shortage amounts and reimbursement for the hazard insurance premiums after the foreclosure took place.

Based on Ocwen's violations of the discharge injunction, for which BONY is also liable as principal for its agent Ocwen, the Court will enter a separate judgment holding the Defendants jointly and severally liable to pay damages of $44,077.07 to the Debtors, consisting of

---

[10]  Assuming a monthly rent of $1,500.00 for the Property (which is probably low for the Property but not if the rent does not include insurance and real estate tax payments), the Debtors may have expended $76,500.00 ($1,500.00/mo. X 51 mos.) in rent.  Assuming annual insurance payments of $500.00, the Debtors may have expended $2,125.00 ($500.00/yr. x 4.25 yrs.) for insurance.  With real estate taxes for the Property accruing at $6,000.00 per year, the Debtors may have expended $25,500.00 ($6,000.00/yr. x 4.25 yrs.) for real estate taxes.

$13,000.00 for emotional distress and $31,077.07 for attorney's fees and expenses.  The Court will not enter a default judgment against Saxon as the trial record does not establish any grounds for entering a judgment against it.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

ENTERED at Manchester, New Hampshire.


Date:   May 17, 2017                              /s/ J. Michael Deasy
                                                 J. Michael Deasy
                                                 Bankruptcy Judge